BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    .
                           . Case Number 24-cr-239-1
        Plaintiff,       .
                           .
   vs.               .
                           . Washington, D.C.
DOUGLAS EDELMAN,        . May 16, 2025
                           . 9:40 a.m.
        Defendant.      .
- - - - - - - - - - - - - - - - - -

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:    SARAH RANNEY, ESQ.
                        EZRA SPIRO, ESQ.
                        United States Department of Justice
                        150 M Street Northeast
                        Washington, D.C. 20002

                        JOSHUA GOLD, AUSA
                        United States Attorney's Office
                        601 D Street Northwest
                        Washington, D.C. 20579

For the Defendant:       GEORGE CLARKE, III, ESQ.
                        Baker & McKenzie LLP
                        815 Connecticut Avenue Northwest
                        Washington, D.C. 20006

                        SONYA BISHOP, ESQ.
                        Baker & McKenzie LLP
                        452 Fifth Avenue
                        New York, New York 10018

Official Court Reporter:    SARA A. WICK, RPR, CRR
                        333 Constitution Avenue Northwest
                        Room 4704-B
                        Washington, D.C. 20001
                        202-354-3284

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  Criminal Case 24-239-1, the United States versus Douglas Edelman.

Counsel, would you please identify yourself for the record, starting with the government.

MS. RANNEY:  Good morning, Your Honor.  Sarah Ranney and Ezra Spiro and Josh Gold for the United States.

THE COURT:  All right.  Good morning.

MR. CLARKE:  Good morning, Your Honor.  George Clarke and Sonya Bishop for Mr. Edelman.

THE COURT:  Okay.  And good morning, Mr. Edelman.

THE DEFENDANT:  Good morning.

THE COURT:  All right.  We were last in court on April 4th, and this date, which was done after that time period, we had originally set a June 4th next status, which was chosen in order to have Mr. Edelman enter into a plea.

Having been provided some of the information about the nature of the plea in terms of the split and various other things, it seemed that it would be advisable to convert this into a discussion of the plea and the issues associated with it and then set another date for the actual plea.  So that's why I converted it into a status.

So just setting out a couple things, and then I have a bunch of questions, which I sent most of it out so that you had

some idea of what I was getting at.  So we've converted this really more as a discussion about what is involved with it.

So the basics, as I understand it, there's no plea agreement with the government.  It's not going to be an *Alford* plea regarding the facts.  As I understand it, Mr. Edelman wants to plead to Counts 1 through 10, which is a conspiracy -- which it's not clear to me how you would split it, but a conspiracy until 2012, the false statements that are around 2016, and the tax evasions go through 2012 as well, and then presumably, a trial on Counts 11 through 30, not clear what happens to the rest of the conspiracy after 2012.

So what I would like to start with is to put on the record the plea offer that the government made and go through that.  So presumably, Mr. Edelman has rejected that.  So I think we need to put that on the record.  So what I would ask is if you would indicate -- and it will be useful as a backdrop, frankly, for our further discussion with where we are with what he has labeled as an open plea, is to indicate what the statutory penalties are if he goes and gets -- if he's convicted, what the advisory sentencing guidelines for that, what the plea offer is, what would be involved in terms of the statutory penalties, which would be the same that are already discussed but the advisory sentencing guidelines, and then I will have a discussion with Mr. Edelman.

MS. RANNEY:  Yes, Your Honor.

THE COURT:  You can take the mask off, in terms of if you're speaking to take it off.  Otherwise, we don't really get a good record.

MS. RANNEY:  The government's offer to Mr. Edelman was a plea to one count of conspiracy in violation of 18 U.S.C. 371.

THE COURT:  So that's Count 1, I think.

MS. RANNEY:  Count 1.  One count of tax evasion in violation of 26 U.S.C. 7201.

THE COURT:  Which count was that?

MS. RANNEY:  So it would be Count 3, Your Honor, but it would be contemplating the full loss of all the years.  It would be one count of tax evasion for all of the charged years.

THE COURT:  Okay.  Hold on.  So Count 3 would encompass the full loss due to the tax evasions that the government has charged?

MS. RANNEY:  Correct.  And my apologies, Your Honor.  It's actually Count 4.

THE COURT:  Oh, okay.  So is it the statement of -- it would be Count 4, but the Statement of Offense presumably would be covering all of the --

MS. RANNEY:  Right, it would cover all of them.  And then also a plea to Count 2, which is a violation of 18 U.S.C. 1001.  So it would be Counts 1, 2, and 4.

THE COURT:  -- false statements, I think?

MS. RANNEY:  So conspiracy, tax evasion, and false

statements.

THE COURT:  Okay.

MS. RANNEY:  And an agreement to -- I believe the last plea offer we put out would allow Mr. Edelman to make certain arguments about the tax loss, so not requiring him to stipulate to a particular amount but to stipulate to a range, that it was not less than $25 million and not more than $150 million.

THE COURT:  So the stipulation would be the range of the loss?

MS. RANNEY:  Correct.

THE COURT:  We're not talking about the sentence, but the loss, which obviously would factor into the advisory sentencing guidelines.

MS. RANNEY:  That's right.  And that span encompasses two different base offense levels under the tax loss table.  So it's a difference of two points if he were to successfully argue that it was between 25 and 65 million and then two additional points if the loss is found to be between 65 and 150 million.

THE COURT:  So the arguments regarding the tax law would affect the loss amount in terms of the calculations --

MS. RANNEY:  Correct.

THE COURT:  Okay.  So what would be -- without getting into what the arguments are, can you give me in very summary form the difference?

MS. RANNEY:  Absolutely.  So the government's plea

offer also contemplated him agreeing to certain enhancements justified by the conduct, including having used sophisticated means, which is a plus 2, having obstructed justice, which is a plus 2, and having been a leader/organizer of criminal activity involving five or more participants, which is a plus 4.

THE COURT:  So the sophisticated means, which is two points, I think.

MS. RANNEY:  Correct.

THE COURT:  Obstructing justice, two, and then the leadership/organizer is 4.  So those are the enhancements.

MS. RANNEY:  Correct.  And the government, after conveying this offer, clarified that before the taking of Mr. Collett's Rule 15 deposition, the government would agree that acceptance of responsibility warranted the full three points, but after doing that part of the trial early, the government would take the position that only two points for acceptance of responsibility were warranted, given the resources put into the deposition.

THE COURT:  Whose deposition are we talking about?

MS. RANNEY:  The Rule 15 deposition that was conducted in the United Kingdom in February.

THE COURT:  Involving whom?

MS. RANNEY:  The person charged in the indictment as co-conspirator 1.

THE COURT:  Is that the one that's already done, or is

that one that would have come up?

MS. RANNEY:  Correct, that's the one that was already done.  It was four and a half days in London the first week of February.  I'm sorry, three and a half days.

THE COURT:  Since that's already occurred, presumably, you're indicating the acceptance of responsibility would involve minus 2 and not minus 3; is that what you're saying?

MS. RANNEY:  Correct.  That was the government's position, which was conveyed before the deposition.

THE COURT:  Okay.  So how does that come out in terms of -- those are the particular terms.  What are the -- what would the calculations be for the advisory sentencing guidelines?

MS. RANNEY:  So that puts Mr. Edelman, if the government were to successfully prove up the higher base offense level between 65 and 150 --

THE COURT:  Go through base offense and the whole thing so it's clear.

MS. RANNEY:  So with the higher base offense level, that relates to a total adjusted offense level of 36, which with the criminal history category of I corresponds to a 188 to 235 --

THE COURT:  Hold on.  So the 36, you would then add the four points and the other four points, or is that encompassing it already?

MS. RANNEY:  No, the final adjusted offense level is 36.

THE COURT:  Okay.  So what I'm asking you to do is start off with the base offense, and then add each one of these things, so we have on the record exactly how you get to 36.

MS. RANNEY:  Okay.  So the government -- in the lower offense level, the base offense level is 28.  I want to make sure I'm accurate.

THE COURT:  What I'm trying to do is base and then all of these enhancements added.

(Government counsel conferred.)

MS. RANNEY:  So the lower base offense level, if the tax loss were between 65 -- I'm sorry, between 25 and 65 million --

THE COURT:  You're not listening to me.

MS. RANNEY:  Oh, sorry.

THE COURT:  Let me try this again.  I want the numbers.  The base offense, what is the number, and then you add the enhancements and come up with a total offense level.  That's what I'm asking you to do.

MS. RANNEY:  Yes, Your Honor.  With a base offense level of tax loss between 25 and 65 million, that's 28.

THE COURT:  Okay.  And then you would add these enhancements?

MS. RANNEY:  Correct.  Plus two, sophisticated means;

plus two, obstruction of justice; and plus four for leader/organizer with the note that with the adjustment for being a leader/organizer, Mr. Edelman would be ineligible for the zero-point offender adjustment under 4C1.1.

THE COURT:  Because of the leader?

MS. RANNEY:  Correct.  So there would be no minus 2 for that down the road, which is why --

THE COURT:  So the lower one is, based on the loss of 20 to 65 million, you would start off with 28, and then you would add all of these, and we come up to 36.

MS. RANNEY:  Correct.

THE COURT:  Criminal history I comes to what?

MS. RANNEY:  188 to 235.

THE COURT:  Okay.  And if you used the higher level, which would be what?

MS. RANNEY:  So if the government proved that the loss was between 65 and 150, the base offense level would be 30.

THE COURT:  And then adding the other?

MS. RANNEY:  And then adding in the adjusted -- adding in the sophisticated means, obstruction of justice, and leader/organizer, with a minus 2, that gets us to 36.

I'm sorry, Your Honor --

THE COURT:  38, okay.  So both of them -- the higher-level one, which involved the 65 to 150 million, is the -- it's 38, and then you do a minus 2; is that correct?

MS. RANNEY:  Your Honor, I actually -- the first number that we did ending up at 38 does not contemplate the minus 2 for acceptance.  So the higher would result in a 36, and the lower would result in a 34.

And if it would be easier for the government to submit this computation in writing, we can definitely do that.

THE COURT:  We can do that at some point.  What I'm trying to do is put it on the record sufficiently, and then I can talk to Mr. Edelman that he's turning this down, which I understand, before we move to what he wishes to plead to, which is different issues in terms of making comparisons here.

So the higher one, which is the 65 to 150 million, leaving aside -- is acceptance of responsibility going to be a deduction or not, which is the two points, not three?

MS. RANNEY:  So the government's position, Your Honor, is that if Mr. Edelman --

THE COURT:  If this is the plea?

MS. RANNEY:  In the plea offer, yes, he would get the minus 2, correct.

THE COURT:  That's what I'm trying to get at.  So let's get back to the higher level.  65 to 150 million, starting off with 30, then the two, the two, the four, which I believe comes up to 38, minus 2, so it's 36.

MS. RANNEY:  Correct.

THE COURT:  Okay.  And he doesn't get the 4C1.1

because he's a leader.

And then the 25 to 65, which is the lower one, it's 28, plus two, two, four, which is 34, minus the two, which puts it at, what, 32?

MS. RANNEY:  34, Your Honor.

LAW CLERK:  36 with the enhancements and then minus 2 for acceptance.

THE COURT:  Okay.  I see what you're doing.  All right.  And so that's the 188 to 235 range.

And what's it with the 36, criminal history category I?

MS. RANNEY:  My apologies, Your Honor.  With the 34, it's 151 to 188.

THE COURT:  And then the 36 is what?

MS. RANNEY:  188 to 235.

THE COURT:  So that's the plea offer.  So he would plead to count 1, the conspiracy, which would cover the whole time period, I take it.

MS. RANNEY:  Correct.

THE COURT:  Count 2 is the false statement.  Count 4 is the tax evasion, but the loss would be inclusive of all of the charges relating to tax evasion.

Mr. Edelman has an argument about tax loss and how it would apply in terms of the effect on the loss amount, as I understand it, which is why we have the two groupings.

And then the enhancements are two points for sophisticated

means, two for obstruction of justice, four for being a leader/organizer.  And the deduction would be for two points, not three.

MS. RANNEY:  Correct.

THE COURT:  Okay.  So you have the high and then the low, depending on presumably what the Court is persuaded as to which one should apply.

MS. RANNEY:  Correct.

THE COURT:  Okay.  So if he goes to trial and gets convicted of everything, what is he facing?

MS. RANNEY:  The government's position is that he would be facing a base offense level of 30, with the same enhancements, sophisticated means, obstruction of justice, leader/organizer, and his adjusted offense level would be 38.

THE COURT:  Okay.  Criminal history I, and what does that give us as a range?

MS. RANNEY:  235 to 293.

THE COURT:  Okay.

MS. RANNEY:  And in the plea scenario, we would ask for a stipulation to restitution in the amount of tax loss, to be paid to the IRS, and the government would seek that at sentencing if there were a trial as well.

THE COURT:  So the restitution would be sought whether he enters the plea as a part of the agreement or goes to trial; is that correct?

MS. RANNEY:  Correct.

THE COURT:  Okay.  So in the plea agreement, he would be agreeing to restitution but not the amount presumably.

MS. RANNEY:  Correct.

THE COURT:  So the amount would be contested.

And what is the government asking for?

MS. RANNEY:  $128 million, Your Honor.

THE COURT:  Okay.  All right.  So that covers what the plea offer was; is that correct?

MS. RANNEY:  If I could have your indulgence.

THE COURT:  No problem.  Go ahead and consult.

(Government counsel conferred.)

MS. RANNEY:  One final note, Your Honor, about the plea offer is because each of the offenses has a five-year statutory maximum, the max sentence under the plea would be 180 months, if the Court were to sentence him on the --

THE COURT:  So the statutory maximum is five years?

MS. RANNEY:  Correct.

THE COURT:  So the maximum sentence, all right.

Okay.  Is that it?  Do you need to consult?  Go ahead.

MS. RANNEY:  If I could consult one second, Your Honor.

THE COURT:  Sure.

(Government counsel conferred.)

MS. RANNEY:  Yes, Your Honor, I believe those are all

of the relevant facts for the government's plea offer.

THE COURT:  All right.  So let me ask -- before I make an inquiry of Mr. Edelman, let me speak to Mr. Clarke, if you could come up, in terms of -- obviously, this is fairly complicated in terms of arguments about how the tax laws apply, et cetera.

In terms of -- without getting into your attorney-client material, obviously not that, but have you -- is this what you've negotiated with the government in terms of what they were willing to do?

MR. CLARKE:  This is as far as they would go.  Negotiation might be a little --

THE COURT:  But in terms of having a discussion with them.

MR. CLARKE:  Yes.

THE COURT:  Obviously, you can't make them negotiate something they don't want to do.

So this is, I take it, the best -- from your perspective, the best offer that you were able to get from the government; is that correct or not?

MR. CLARKE:  100 percent, Your Honor.

THE COURT:  Okay.  I take it that there -- were there counter-offers or no counter-offers?

MR. CLARKE:  There was no -- from my perspective, based on the discussions we had with them, this was a "take it

or leave it."

I guess when you say "counter," this whole two-range thing when we're talking about the tax loss, that was a part of the discussion. They didn't come with that.

THE COURT: That was something that you proposed, I take it?

MR. CLARKE: Correct. We tried to deal with the four-point enhancement. They said no. We tried to deal with this.

THE COURT: Sure. Okay. All right. And I take it that you had, then, discussions with Mr. Edelman relating to all of this?

MR. CLARKE: Significant, Your Honor, extensive, lengthy.

THE COURT: So in terms of these discussions, in a more conclusory manner, from your perspective, did he seem to understand -- I realize that he's an intelligent person, and obviously, he's familiar with these kinds of things.

But did he appear to understand precisely what was being asked of him?

MR. CLARKE: I think he did. I think most defendants focus on the outcome and that month, the months. And you're talking about, you know, 180 months for a 73-year-old guy. I think that's what he really focused on. But yes, I think he understood it. I certainly did the best I could and Ms. Bishop

did the best she could to explain it to him, to explain the guidelines, to explain the statutory max, to explain how this works.  I think he understands it.

THE COURT:  I take it in terms of the terms that are set up, some things they've agreed to, some things they haven't, would you have gone through all of that?

MR. CLARKE:  Yes, we did.

THE COURT:  Part of the reason I'm asking is I don't want to have any question at a later point that somehow he didn't understand it, since you had raised that competency issue, which I have found that he's competent, but -- based on the report and what information I have.

So I just want to make sure that from your perspective, in talking to him, you concluded he understood not just the bottom line, but basically what was actually in terms of the terms of the agreement.

MR. CLARKE:  I do believe he understands that, Your Honor.  There is one factual issue that, I think, underlies some of this that if you want me to talk about I'm happy to do.

THE COURT:  Okay.

MR. CLARKE:  So this case in a sense involves almost two sets of conduct -- this goes to what we're proposing to do -- through 2012 and post-2012 when a trust was formed by a big London law firm.

And that trust, from my client's perspective, is a point in

which he gifted these income-producing assets to his wife.  And so it is extremely difficult for him to -- and by the way, that trust has an official trustee that I've dealt with, that he has had to deal with, that other witnesses have had to deal with. His perspective is that from that point in time, he can't be taxable because he didn't own it, and that is a gating item factually on the government's plea.

So regardless of what the outcome is, which is obviously very significant for him, mentally, he can't say "I owned it" because he thinks the trust owned it from 2013 forward, Your Honor.

THE COURT:  All right.  That explains some things. All right.  So that would cover the issue of the conspiracy in terms of pleading to the conspiracy, the full amount, and the tax evasion amounts; is that what you're saying?  In essence, it affects his looking at it?

MR. CLARKE:  Absolutely.  And I can explain how we don't have a problem, a statute problem, and I think the government agrees with this, on 2012, but that's with respect to what he's proposing to do, not what they proposed to him.  So we can separate that if you want later.

THE COURT:  But we're talking about what affects Mr. Edelman's consideration of the plea.

MR. CLARKE:  Yeah.

THE COURT:  Okay.  That it covers post-2012 conduct?

MR. CLARKE:  Correct, and that's a problem for him.

THE COURT:  All right.  Okay.  Anything else that I should know?

I want to make sure that however we go forward, that there are no issues that I'm not aware that I need to inquire about.  So that's why I'm talking to you first.

MR. CLARKE:  Thank you.  On the subject of the government's plea and why we rejected it, I think it's been adequately aired out.

THE COURT:  All right.  Then let me ask Mr. Edelman some questions, if I may.

You need to swear him in, Dorothy.

I'm going to ask you to stand for a second.

(Defendant sworn.)

THE COURT:  All right.  If you could go ahead and sit down.  You don't need to stand for this.  If you want to talk to your lawyer at any point with my questions, you can do so.

THE DEFENDANT:  Okay.

THE COURT:  Just push the button below the green light.  That mutes it, and we can't hear what you're talking about.

So Ms. Ranney set out the plea offer, the different conditions that we talked about, the counts that you would have to plead to in their offer, what it would encompass in terms of the loss amount, which is really geared towards the advisory

sentencing guidelines in this area.  That makes a difference in terms of -- and your conduct as to what the ultimate base offense.

So this is all numbers, you know.  The commission set this up, the advisory sentencing guidelines, so judges would sentence with more uniformity and there would be more parity.  So obviously, it's all numbers.

And the base offense usually in these kinds of charges is going to be the loss.  So you've got two.  You would propose to have two legal arguments which would make a difference in terms of what could be considered the tax law.  And then they've added certain enhancements that they're pushing for which adds onto the base offense and then indicates the two points that you would be deducted for acceptance of responsibility.

The third point, which they control, relates to whether you -- if you had pled early enough, they would not have had to go through and use additional resources, which would be the additional deposition.  So they're unwilling to file the motion for the third point, just so that you understand that.

So do you understand what the plea offer is?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about it?  Have you had enough time to consider all of it, to go through with your counsel each aspect of what's been proposed?

THE DEFENDANT:  Yes, we've had --

THE COURT:  And do you understand that obviously the government controls the plea offer that they give?  So your lawyer can only accomplish so much in terms of talking to them if they're not willing to, you know, agree to something beyond this.  So this is the best -- as I understand it, the best offer that he was able to get from the government.

Would you agree with that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And then do you understand that if you went to trial in terms of obviously there would be -- we will be looking at the tax loss.  There might be differences between the two in terms of your argument for any kind of sentencing.  You would not get the deduction of the two points. The Court would be making a decision about the additional enhancements with the assistance of Probation, which does the original presentence report and does the calculation.  And we would be working from that.

So you would have the different ranges of what it potentially would be in criminal history category I because you have no prior convictions.

So do you understand all of that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions at all, anything that you're hesitant about understanding?  I want to make sure, because the issue was raised in terms of your accepting certain

things and not accepting others when they did the evaluation. So I want to make sure you understand and there's nothing in here that makes a difference in terms of how you made your decision.

THE DEFENDANT:  I think I understand it very clearly. So I'm okay.

THE COURT:  All right.  And that includes the restitution, which is going to be an argument.  In the plea offer, you would agree to restitution, not the amount.  The Court would be making the decision about what the amount was, and you can contest that.  So that portion of it would not be a part of the agreement.  It's just that you would be agreeing to the restitution itself.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  So they made the offer.  I take it that you had an opportunity to consider it.

Did you have long enough time to actually give consideration to whether you were going to accept it or not?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And what's your decision?

THE DEFENDANT:  On their offer?

THE COURT:  Yeah, we're talking strictly their offer.

THE DEFENDANT:  I've rejected their offer.

THE COURT:  So are you satisfied that counsel, your

counsel negotiated in good faith the best terms that he could get, since the government obviously controls whatever plea offer is made?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And is the rejection of the government's plea offer due to any issues with your legal representation, or is it based on your own reasons and your decisions?

THE DEFENDANT:  My own reasons, nothing to do with my advice from my counsel.

THE COURT:  Okay.  All right.  So at this point, we're moving on to what has been proposed by you, which has no agreement from the government.  However, there are three things that you would need to do that you would have to work on jointly, and it would be the elements of the offense of whatever it is you're proposing to plead to, the advisory sentencing guidelines, and the factual proffer that they would accept as meeting those elements.

It's hard to do a plea, even if you don't have an agreement, if you don't agree to the actual facts that are going to support your plea as well as their accepting that this -- those facts actually meet those elements.

Do you understand that, or have I made that too complicated?

THE DEFENDANT:  I understand that, Your Honor.

THE COURT:  All right.  So let me go over what -- if I could get perhaps from counsel what it is that, defense counsel, you're actually proposing to plead to in terms of the -- what you're proposing.

MR. CLARKE:  Thank you, Your Honor.

So we are proposing to plead to the 371, the conspiracy.

THE COURT:  It has a time frame, though?

MR. CLARKE:  There's a time frame on it, and that time frame from an underlying tax perspective goes through 2012.  And you say well, and in your chambers e-mail, how can the statute still be open?  And I point you to -- well, let's back up for a second.

The conduct at issue involves two entities that are income-generating entities, Mina and Red Star.  That's where this income comes from that was not reported.  Those entities were domiciled in Gibraltar until 2010.  They were then moved to Hong Kong in 2010.  They were then moved into this trust that I talk about in 20 -- at the end of 2012.  So that Gibraltar piece is important to focus on.

So if you look at paragraph 56 in the indictment -- I don't know if you have that.

THE COURT:  Okay.

MR. CLARKE:  Paragraph 56 talks about in June 2020 -- I'll wait until you get it, Your Honor.

THE COURT:  I have it.  Hold on.

MR. CLARKE:  It's on page 35, if that's helpful.

THE COURT:  Okay.

MR. CLARKE:  So that paragraph states that in June 2020 co-conspirator 3 contacted a Gibraltar corporate services business to ask that the public registration information for Mina and Red Star be changed to reflect falsely that the 50 percent owner of the companies was Delphine Le Dain, not Douglas Edelman.

That is an overt act in the conspiracy pre-trust, pre-2013, that holds open, I think, no question the 371.  It holds it open.  There had already been a meeting in 2018 dealing with that that already kept it open.  So then 2020, that keeps it open, and that would be open through the indictment.  So we don't have an issue, we don't have a statute issue with respect to 371.

Now, the government -- Ms. Ranney can explain, the government's perspective on this is all about the entire conspiracy.  But that is not our perspective.  Our perspective is that the conspiracy with respect to the trust years didn't start because it wasn't illegal.  He can gift income-producing assets to anyone he wants.  In sentencing, we will show you the regulation that says that that's okay.  And he did that.  The government says that gift didn't happen; we say it did.

And so the 371 is with respect to that conduct, pre-trust conduct.

THE COURT:  Okay.  So pre-trust, does that include beyond -- you say 2012, but you've talked about -- I mean, there's an issue in terms of the statute of limitations and in terms of overt acts going forward.

So are you indicating that some of this -- once the trust you put aside, but what was involved in Mina, Red Star, and Gibraltar goes beyond 2012?

MR. CLARKE:  He had a 1001 when they did the voluntary disclosure in 2015.  He's going to plead to that.  And when the meeting happened with government counsel in 2018 with respect to his other lawyers, that's a Blue Diamond Almond Growers sort of he represented to his lawyers and his lawyers represented to the government, and he knew that.  He's going to plead guilty to that, in 2018.  And this 2020 overt act holds it open through the indictment.

So just to back up real quick, he's pleading guilty to all the charged 7201s through 2012, so '06, '07, '08, '09, '10, '11, '12.  He's pleading to the 1001 for the voluntary disclosure, because that included those years.  It included other years, too, but it included those years.  And he's pleading guilty to the 1001 for 2018, because again it included both pre-trust and post-trust conduct.  He's pleading guilty to it as it respects pre-trust conduct, and the 371.

THE COURT:  I'm going to ask a simplistic question.

MR. CLARKE:  Of course.

THE COURT:  In terms of the conspiracy, putting aside the trust for a second, you're indicating the money from the Mina/Red Star that started whatever year it was that went through 2012, went beyond that in terms -- there were conspirator actions beyond the 2012?

MR. CLARKE:  Absolutely, Your Honor.

THE COURT:  Okay.  So that would indicate, therefore, there would not be a statute of limitations problem?  Is that what you're saying?

MR. CLARKE:  Correct.

THE COURT:  Okay.  And then separately, whatever was put into the trust -- which I take it is a separate amount or the whole thing?

MR. CLARKE:  It's all of it.  Again, this is our perspective.  Those two entities went into the trust.

THE COURT:  So the statute of limitations issue is the additional charges in terms of the obstruction of justice, et cetera, which you're saying are a part of the conspiracy.

MR. CLARKE:  Uh-huh, correct, Your Honor.

THE COURT:  So that's what, according to you, would take it beyond 2012, is the false statements and obstruction of justice aspects of it in terms of the 2012 conspiracy and the actual trust amount -- the amount from Mina and Red Star gets shifted into the trust?

MR. CLARKE:  Correct.

THE COURT: All right. That explains some of this. I was having a little trouble here.

Okay. So that gets to the charges themselves. So let me go through my questions for a second.

So in terms of the -- I guess the question is, is there anything left, from your perspective, to go to trial on in the conspiracy?

MR. CLARKE: Well, we think he's innocent after that period of time, Your Honor, but setting that aside --

THE COURT: I'm just saying, from your perspective, do you view the government's conspiracy still extent because there's a dispute as to whether it went into a trust or relating to the trust?

MR. CLARKE: That is correct, Your Honor.

Just real quick, I expect strongly, I know that the government is going to argue in sentencing that that post-2013 conduct/income is related conduct for purposes of the guidelines. We're going to argue it isn't; they're going to argue it is.

THE COURT: Okay. But my question is, is part of it is what is left for the trial? In other words, as I understand it, assuming the government, which I haven't heard differently, wants to proceed with what he's not pleading guilty to.

So is your view, and then I'll ask the government, is it your view that the conspiracy is taking care of fully the charge

with the way you have structured it?  In other words, there's nothing left for the conspiracy from your argument?

MR. CLARKE:  From my client's perspective, yes.  From a legal perspective, I understand that the government has an argument post-2013 that there's a continuation of that conspiracy, that the trust didn't actually get funded, that these things continued.

Now, does that mean we're going to have a trial?  My perspective is if we get him sentenced, depending on how that sentence turns out and depending on --

THE COURT:  Well, we'll get to --

MR. CLARKE:  -- we probably won't have a trial. That's my perspective.

THE COURT:  We'll get to the sentencing issue, which has some issues with it.

Let me just ask one quick question so I get the answers, and then I will bring you right back.

MR. CLARKE:  Okay.

THE COURT:  So from the government's perspective in terms of the conspiracy, which I had issues with, now, I understand what their theory is, that you would not have a statute of limitations problem because there's actions that are taken after that that are all a part of the conspiracy and they sort of -- it's their argument there's nothing left in the conspiracy because it goes into this trust.

So from your perspective, is it that there's -- whatever they view as going to the trust and not illegal, your view that it still is a part of the conspiracy, so you would presumably want to go to trial on it, or where are you on it?

There's no agreement, but I want to know what your viewpoint is.

MS. RANNEY:  Your Honor, the government's view is that we are negotiating a Statement of Offense that would meet the elements of Count 1 and that once he pled to a satisfactory Statement of Offense meeting the elements, that the loss associated with the conspiracy would be for sentencing.

So to answer your question, if the Statement of Offense meets the elements, no, we would not be looking to then have a second conspiracy trial on this charged count.

THE COURT:  Okay.  So assuming you can agree to a Statement of Offense that allows you to argue the loss that you want to argue -- they're obviously disputing it, but that allows you to at least factually make an argument, then as far as you're concerned, that takes care of the conspiracy?  There's nothing left?

I was sort of left with the impression that somehow you were cutting the conspiracy in half, which I didn't see how this was going to work trial wise, so assuming you can agree to it.

Now, if you can't agree to it, I take it there's a problem.

MS. RANNEY:  That's right, Your Honor, but I think

that -- it sounds like the parties have worked together to come up with a Statement of Offense that's far enough along that I feel very confident that we will have one that the government agrees meets the elements.

THE COURT:  Okay.  So the Statement of Offense would take care of, sufficient from your perspective, the loss, which will be an argument but differing views, such that there's no need for a trial on a conspiracy?

MS. RANNEY:  On Count 1 in the indictment, Your Honor, correct.

THE COURT:  Okay.  That solves that first problem.  If I can get you back for some of the rest of this.

Okay.  So working down my questions, we've really answered the second one, which I thought had sort of a split.

And then we talked about -- so the statute of limitations you're agreeing is not going to be an issue, from your perspective?

MR. CLARKE:  Correct.

THE COURT:  And you've discussed that with your client?

MR. CLARKE:  Extensively.

THE COURT:  And would the government agree?

MS. RANNEY:  Yes, yes, Your Honor.

THE COURT:  Okay.  So in terms of what -- at this point, what would he be going to trial on, then?  What counts

would he -- assuming that he's not pleading to all of it, assuming the government still had these counts out there, which counts are actually left?

MR. CLARKE:  It would be the 7201s for 13 through 20, and it would be the FBARs.

THE COURT:  So basically, 13 to 30?

MR. CLARKE:  Correct -- no, it's 11 through 30.

THE COURT:  That's right, 11.  I have a chart here. Where's my chart?  Okay, yeah, starting -- the 2013 Count 11.

MR. CLARKE:  Correct.

THE COURT:  So without getting into -- my question, question 2 regarding the trial, I'm not ruling on the admissibility, but there could be an argument made under 404(b) that -- relating to, you know, his guilty plea in terms of affecting the other counts.

So is that something that you have a concern and discussed with your client?

MR. CLARKE:  We have discussed it.  I think his perspective, as is mine, is he's pleading guilty to what he's guilty of and not guilty to the things he's not guilty of, and he would be happy, if there was a subsequent trial, which again I don't think there will be, to say that, or to have me say that probably.

THE COURT:  Okay.  So he's aware that pleading guilty may mean that his admissions could be used against him?

MR. CLARKE: Yes, we've talked about that.

THE COURT: Okay. All right. How does this -- assuming the counts that are left in terms of going forward, how does that affect the length of the trial? Do you know? Or would the government? Do you have some sense of what the length of the trial would be?

MS. RANNEY: Yes, Your Honor. We think it would cut it down but maybe not substantially. We were just debating between ourselves maybe two and three weeks. It would still be a substantial trial. I think we would say three to be safe.

THE COURT: All right. Then three, getting into the sentencing in terms of sentencing before there would be a trial, as I pointed out, there's 120 days to prepare the presentence report, and there can be objections or not, and then presumably, depending upon what position the Probation Office takes about the loss, you know, there will be an objection from the other side, whatever position they take, which the Court will have to resolve.

I would say -- I reached out to Probation, because it is sort of unusual to have this. Now, if the conspiracy is not being split, which I thought it might be, so you would have him pleading to part of it but we'd be going to trial on the other half. Probation said no, you don't do that, it's a problem, not that the Court wouldn't have necessarily the power to split it, but it raises questions about appellate jurisdiction, if you did

the first sentencing, maybe a double jeopardy issue.  I don't know whether there would be some issues.

So I have a concern about having the -- giving him the full sentence based on the plea and then getting ready for the trial, if he got convicted on it, how that would work in terms of doing another -- basically another sentence.  So you would have the cases sort of split.

And there was a proposal -- Judge Moss is the only person I'm aware of that had something similar.  Ultimately, they agreed not to go that route, so it never happened.  But there was issues back and forth relating to, and the solution that was being proposed is that the plea would be one case and what went to trial would be a second case in terms of doing the sentencing.  I don't know whether that's -- it never actually came to fruition, and Judge Moss never had to decide it, but there's at least some briefing around the case.  But that's the only one that I could find.

Probation was weary about having in the same case a sentence, part of it, and then holding off on the rest and then doing a second sentence, as to how this would all work.

MR. CLARKE:  I have a perspective on that, Your Honor.

THE COURT:  I'm sorry?

MR. CLARKE:  I have a perspective on that, Your Honor.

THE COURT:  I'm bringing it up so that you can tell me what your perspective is.

MR. CLARKE:  My perspective is that this is a tax case, and the sentence is driven -- well, the guidelines are driven solely by the tax loss.  Right?  That's our starting point.

THE COURT:  Right.

MR. CLARKE:  Now, we're not going to argue that that is the correct sentence, I'm sure you know, but that is the starting point.  And that starting point, the parties are going to argue pretty extensively whether this post-2013 conduct, which would be subject to whatever that trial is, is in or not in.  Okay?

And without arguing against my position, which I think is correct, to the extent that 2013 conduct is in, there would be no basis for a later sentence.  There might be a basis for a later trial, but if you sentenced him on that 2013 income, if you included that in the tax loss, there would be no basis to sentence him to something -- you would have a trial for no sentence, okay, because you had already sentenced him for that tax loss.

Now, our position is the contrary to that, that actually what we're going to argue in sentencing is that that income isn't his income at all.  Okay?  And if the Court in the context of that sentencing were to find that argument meritorious, I suspect that my colleagues may not be interested in trying that second half.  You have to speak to them about that.

THE COURT:  Okay.  So if I began putting it very simplistically from my perspective, so if the sentencing, you consider the loss, and if the loss in essence, if I agree with the government, includes the -- what would be the amounts that you would go to trial on and that's what I sentence him on, then there's no point -- there's no second sentence, because you've already sentenced him on the amount of loss that would have encompassed it.

MR. CLARKE:  And in addition to that, if you were to find it were inappropriate to include those in there, the most likely reason that you would be finding that is that it isn't related to the conduct and, therefore, probably is something that he wasn't guilty of.

THE COURT:  Okay.  So let me ask where the government is on this issue, because it seems to hinge on the tax loss, which obviously is the key part in all of these tax cases, both in terms of sentencing and what you're going forward on.

So as I understand it, there's these two arguments:  Do you include the trust, I'll call it the trust versus not including the trust amount, that in essence that resolves the issue of not going to trial or it affects the trial decision.

If I've decided against you, there's no point in going to trial, if I understand defense counsel.  Or if I agree with you, then there's no point in going to trial because you're getting the money anyway.  I've already put it into the pot in terms of

what you're getting for restitution or anything else.

I'm making it very simple, but just to see where you are with it.  So where are you with this from the government perspective?  Why don't you come up.

MS. RANNEY:  May I have one moment to consult with my co-counsel, Your Honor?

THE COURT:  Absolutely.

MS. RANNEY:  Thank you so much.

(Government counsel conferred.)

THE COURT:  And I don't know whether you need more time to actually think this through, but I'm trying to get to the sentencing.  Both Probation and I have a real concern about, if we actually wind up having to do two sentences, that that creates some issues relating to one sentence and then, obviously, it's going to be a break and some period before you do the other, and appellate jurisdiction and a bunch of other things would affect the first one, that that might be affected.

So I don't know whether you agree with sort of his analysis of if you include it, basically you've gotten what you wanted, and you might not go forward; if it's not included, you might decide -- I don't know whether you would or would not decide to go forward.

So where are you on this?

MS. RANNEY:  Certainly, Your Honor.

So we would propose that -- right now, we're not in a

position to be able to make a firm statement either way of whether we would or would not go to trial.  We're not authorized to make that conclusive decision right now.

But we would propose that if there was a hearing with some factual findings on these key issues, like for example the tax loss or some of the enhancements, that after a finding, we would be in a position to seek authorization to take a position either way.

THE COURT:  So you would see that as having a hearing with these factual findings that the Court would make prior to doing any sentencing?

MS. RANNEY:  Correct, Your Honor.  If it was essentially kind of a two-part -- or theoretically a two-part situation, we could have findings made, and then at that point, we could seek authorization to have the government's position on whether it was going to go forward with the trial or not.

THE COURT:  If we structured it as we're not deciding we're going to have two sentences at this point, so it may not work out to be two sentences, but at the end of, say, the plea before the trial, at the point of the sentencing, so we would get the presentence report, et cetera, et cetera, and we would have a hearing on factual findings or I would be making a decision as to whether the trust is included or not basically is what it comes down to.

And then based on that decision, there would be a decision

as to whether you would go forward with the sentencing, whether you would go forward with the charges.

MS. RANNEY:  Yes, Your Honor.

THE COURT:  In other words, I am really concerned about splitting the sentencing.  But if you would be making the decision and I would be making the decision after factual findings, at least we would have information as to whether the trust is included or not, which would obviously impact my decision about whether to have two sentences and your decision whether you're going to go forward on any remaining charges.

So that's what you're proposing?

MS. RANNEY:  Correct, Your Honor.

THE COURT:  Okay.  Where are you on this?

So there would not be an agreement in advance that there necessarily would be two, but we would be making the decision about the trust as to whether that money is included or not, which would affect whether we need to do two sentences if you went forward to trial and probably primarily whether they're going to go to trial on the other counts.

MR. CLARKE:  Sounds perfectly reasonable to me.

THE COURT:  All right.  Let me just see what -- would you agree that if we did wind up with two, that there is some potential issue about appellate jurisdiction in terms of bringing up, assuming you wanted to -- in terms of the first sentences, by the time you did the trial and did the second

sentence, there might be a problem with that?

MR. CLARKE:  I don't think so, but I have just thought about it for the last ten minutes.

THE COURT:  Okay.  I mean, the three things that we thought were potential issues -- I don't know that they are but something that should need to be looked at before there's a decision to do this so he's not waiving it, would be appellate jurisdiction about the plea and the sentencing associated with that versus going forward, assuming we were going to trial, a potential double jeopardy issue depending on what was covered in the trial that was not covered in the -- and some of this is going to be -- some of it could be considered or not considered as a part of the conspiracy.  So there might be an issue -- although you're not going forward with the trial, there might be some decisions made or facts that are included in it that could raise a double jeopardy.

You know, I wasn't totally certain.  This was more of an issue if you actually were going forward with the conspiracy and two things, a plea and another.  I think it's less likely to be an issue.

MR. CLARKE:  Just on that one, Your Honor, I don't think that there's a double jeopardy issue, because generally in tax cases every year stands on its own.  So everything else that's post-2013 through '20, those are separate -- they could have brought that as two different indictments.  They could have

indicted him on one and tried it and indict him again. They do that. With tax protestors, that happens all the time.

And so I don't see that. I mean, I do see it if we were splitting the 371, but I think that given the government's perspective, which is consistent with my perspective, that if we agree to the Statement of Offense we don't have a splitting of that, I don't see it. I don't see a double jeopardy issue at all.

THE COURT: Okay. Anything else? Because what I will do is -- I'm going to take a little break and make sure I've covered everything and going forward in terms of what I would want for the materials for the plea and in terms of what -- some of the things we've talked about today and that we've clarified, that we've put them in writing so it's clear cut what we've agreed to.

Looking at the material, I couldn't tell if you were splitting the conspiracy into, frankly, the plea and the trial. We've clarified that. So a couple of things that would make it clear.

Is there anything else I should know?

MR. CLARKE: The only thing that I would raise, Your Honor, is we are going to be -- well, I am right now asking you to reconsider your decision remanding him to custody, given this change in circumstance, that he has -- again, one of the main reasons you focused on in your opinion was, you know, he

tampered with witnesses.  There's no question he's a flight risk or danger.  The government didn't even allege those things.  Right?

He's now accepted responsibility.  One of the things in your opinion was that he wasn't taking it seriously.  He's clearly taking it seriously now.

So we would ask you to -- we've also got some really serious issues with his family.  He is unable to talk to his European kids functionally because they don't have U.S. SIM cards.  It's a big, difficult issue.

THE COURT:  Okay.  I'm going to leave that as a separate issue.

MR. CLARKE:  I just wanted to let you know, Your Honor.

THE COURT:  I'll do that at a later --

MR. CLARKE:  We should set a schedule for that.

THE COURT:  I asked you to bring whatever you wanted.

MR. CLARKE:  Okay.

THE COURT:  All right.  Anything else from the government's perspective?

MS. RANNEY:  Yes, Your Honor.

Just in terms of scheduling, I think it makes sense to let you know what the government's proposal would be generally speaking.  Because we have, you know, potentially witnesses who would need to think about holding their schedule, we would

ask -- if there was a sentencing date set, we would ask that the trial date essentially be moved to a date in the future so that relevant people could hold that time.

So depending on how all the mechanics of this came out, for example if sentencing was in September, we would likely ask that trial be adjourned to February or something along those lines. So just thinking kind of longer term about how the scheduling would look.

THE COURT:  That, I need to look.  A couple of my matters have moved around.  One pled, and so I have an opening. But you're not talking about during that period.  At this point, the trial is set for October 20th.

MS. RANNEY:  I'm sorry, Your Honor.  I missed the last thing you said.

THE COURT:  The trial is set for October 20th.  I have some movement.  I do have some trials going into next year that involve co-defendants in a fentanyl conspiracy thing, which isn't going to be short.  So I would need to take a look at it.

But I agree that the likelihood is that it would push it back.  You need 120 days.  This is fairly sophisticated.  So they're going to need 120 days to do the presentence report, for me to actually get it.  You will have objections in between. They're going to wind up making some decision or recommendation about the loss and a bunch of other things.  So it won't be -- it's not going to be a quick process is what I'm saying in terms

of the sentencing.

What we could do, it seems to me, is to do the plea, and we probably should get the presentence report without -- this is throwing it out.  I will take a break and give some quick thought to how we want to do dates.  What we might consider is the presentence report and at that point set a date for a hearing on the facts.  I don't know that I need your memorandum in aid of sentencing at that point.  I would have to consider anything before the sentencing.

So we could potentially set the plea, move on the presentence and this factual finding issue, which could affect, one, whether we need the trial from the government's perspective and, two, whether I wind up doing two sentences on the different charges.

So we might be able to set that date before we fool around with picking dates for the trial and obviously would probably move it beyond the October date.  I think that's correct.

MS. RANNEY:  Yes, Your Honor.  We're throwing this out here just for planning purposes with the intention that nothing would actually change unless or until the plea was entered by Mr. Edelman.

THE COURT:  Okay.  All right.  Let me take a break and sort of go over a couple things that I need to do and come back and make sure that I've covered everything, now that I've got a better explanation, and then sort of what we're going to do

taking steps next and set dates for when you're going to do things related to presumably the plea.

MR. CLARKE:  If I could just be heard.

THE COURT:  Sure.

MR. CLARKE:  Your Honor, I guess two things just when you're thinking about dates.

I think the government's perspective and defense counsel's perspective is we should set this plea soon, Monday maybe.

THE COURT:  I wanted to set dates for things that I would need to do the plea, set the plea date, and potentially set a presentence date and a hearing date so that I can do it with my own trial calendar, since we're going to have factual findings relating to the trust issue --

MR. CLARKE:  Understood.

THE COURT:  -- which will affect their going forward or not going forward and either I wind up with two sentences or not.

MR. CLARKE:  Sounds good, Your Honor.

THE COURT:  So there are a couple of dates we can set, perhaps not all of them.

Let me go back and make sure I've covered everything, and I will do a quicky summary, and we will put something in writing to make sure we all agree to what it is.  And I will have a few questions for Mr. Edelman, but I will go over this more carefully when we actually do the plea.

MR. CLARKE:  Of course.

THE COURT:  All right.  Why don't you give me 20 minutes, 5 after 11.  If I need more time, I will let Ms. Patterson know.

(Recess taken from 10:46 a.m. to 11:31 a.m.)

(Call to order of the court.)

THE COURT:  All right.  Let me clear up a couple of things, and I will articulate to you my concern.

So as I understand the proposed proceedings, first, the parties agree to a proposed Statement of Offense covering the charges to which Mr. Edelman proposes to enter an open plea.

Second, the Court holds a change of plea hearing at which it considers Mr. Edelman's proposed open plea.

Third, the Court would hold a further hearing at which it considers the amount of the loss involved in the offenses included in Mr. Edelman's proposed open plea.

That's what I understand is what you're proposing.  Am I correct?  Have I articulated it correctly?

MS. RANNEY:  That's correct, Your Honor.

MR. CLARKE:  Agreed, Your Honor.

THE COURT:  Okay.  So once the Court decides the amount of the loss, then the government, as I understand this proposal, would then make a decision about whether it intends to proceed to trial on the remaining charges.

So my two central questions are this:  First, whether the

amount of the loss involved in the offenses to which Mr. Edelman proposes to enter an open plea depends on any disputed factual issues or only on pure questions of law and whether any disputed factual issues are relevant to Mr. Edelman's guilt.

If there -- and I'm getting at the hearing. If there are disputes of fact not encompassed in the Statement of Offense that are relevant to Mr. Edelman's guilt, it appears to me that I wouldn't be able to accept the proposed plea.

Alternatively, what you could do is hold a bench trial on partially stipulated facts, resolve the remaining factual disputes, make findings of fact and conclusions of law, and then enter the judgment, which would cover the whole case.

It would still leave separately -- because I understand it -- let me finish setting this out.

So with that summary setting out, what does the government envision would be included in the Statement of Offense for the charges to which he's proposing to enter the open plea? Are there factual issues relevant to his guilt that would not be included?

Second, do the parties agree that a dispute of fact that is relevant to determining the amount of the loss is an issue that must be decided in the context of a trial rather than some kind of a post-plea sentencing hearing?

In other words, if all of the facts are agreed to, including whatever is involved in this trust, and it's strictly

a legal issue in terms of applying the law, whatever laws are at issue, to the facts, then it's, I think, a fairly simple proceeding.

If the hearing would be disputes of fact, then it seems to me that creates a problem about what he's actually pleading guilty to. And if I'm resolving facts, am I resolving facts that relate to his guilt as it relates to the trust? Because that seems to be the separate thing. So the Statement of Facts that you're going to provide, does that cover his guilt, period?

And then the hearing before sentencing, does that involve strictly a discussion of what law applies to these facts, or is there another record that's being developed that would presumably encompass the other? Then I think there may be some issues here.

So which is it?

MR. CLARKE: I have some thoughts.

THE COURT: Whoever wants to answer.

MR. CLARKE: I have a few thoughts on that, Your Honor.

I don't think that there are disputed facts, with one exception, I guess. I don't think there are disputed facts that would be -- that you would necessarily have to have a trial to determine.

The facts that he is pleading guilty to are all the facts that are relevant to the charges that he is pleading guilty to.

THE COURT: Okay. So let me say, the conspiracy supposedly covers everything. So if the loss relates to whether the trust is included or not included, are there facts relating to this trust that are disputed?

MR. CLARKE: There are; there are. But, Your Honor, there are, but that is really about whether, from a guideline perspective, you include that as related conduct or not. And I think that's what the government is going to argue. They're going to say look, he's not pleading guilty to 13, 14, 15, we're not saying that, he's not pleading guilty to those years, what we're saying is that that's related conduct -- they can speak for themselves, but that's related conduct that should be included. That's what they're going to be arguing.

THE COURT: But the Statement of Offense that they're going to give us, it covers what he's pleading guilty to.

Does it include anything related to the trust?

MR. CLARKE: No, because he's not pleading guilty to that.

THE COURT: Okay. So the hearing is going to be what, this hearing before the sentencing? Am I making decisions about facts, or is it strictly we know what the facts are, they're not disputed, and you're applying the law?

MR. CLARKE: You're making decisions about what the loss amount is, which will, I think, from the government's perspective require you to include related conduct. And our

perspective will be that will not be related conduct. And there will be presentations about what that is, but you're not making factual findings other than figuring out what the law says.

THE COURT: Do any of these findings get to the issue of his guilt, whether it's the guilt that he's pleading guilty to or in terms of anything related to making a decision about the trust?

MR. CLARKE: As to his guilt?

THE COURT: You're putting it into the sentencing, but what I'm saying to you is, if I'm making decisions on a factual record that goes to his guilt of not reporting what was included in the trust, then that certainly gets to the issue of his guilt.

That's what I'm trying to figure out. The Statement of Offense, is it going to include the income that's in the trust?

MR. CLARKE: It will not, Your Honor; it will not.

THE COURT: So is there a dispute about what income it is?

MR. CLARKE: The amount?

THE COURT: Yeah.

MR. CLARKE: No.

THE COURT: So what's the facts that I'm making a decision about, then, in this separate hearing? I understand the legal thing in terms of doing it, but what factual record is being developed?

MR. CLARKE:  I don't think you are making a factual -- I mean, you're making decisions that lead you to a conclusion as to what the loss amount is.  I guess that's deciding something, but you're not doing it for those purposes.  You're doing it for the purposes of determining what that loss amount is.

And I think that happens all the time when you have a contested question about what the loss amount is.  Was this deduction correct or not?  Was this offset amount correct or not?  Did --

THE COURT:  But the loss amount would include presumably the amount that you say is in the trust and they say doesn't matter, it's still a loss to him; right?

MR. CLARKE:  Correct.

THE COURT:  Okay.  So you're viewing this strictly in the context of how do you determine the loss amount, and then based on that, you apply two different legal theories?  I'm still having problems here.

My concern is -- and I will get back to it.  My concern is, in terms of what he agrees to pleading guilty to in the Statement of Offense, is there something left out that would still be required to have a guilty verdict or a guilty finding as to, you know, this separate proceeding that we're talking about?

MR. CLARKE:  Setting aside that potential later trial, Your Honor, that we're not talking about right now, no, no.

You're determining what the loss amount is and whether those amounts are included or not as related conduct under the guidelines.

THE COURT:  Okay.  So the Statement of Offense -- let me ask the government, what do you think is in the Statement of Offense?  What's it going to cover in terms of -- that he is agreeing to and I would be finding him guilty of in the context of particularly the conspiracy?

It goes to 2012.  Does it include the income that was in the trust, so does it make any difference in terms of a finding of guilt that there is this extra income which isn't covered by either of these proposals as to whether, you know -- so you're calling it a loss, but to some degree, is he guilty of, frankly, having this income?

I mean, if that's not included in your Statement of Facts, then I'm not sure how you get to the loss if he's not -- we don't have some finding or some agreement on his part that he's actually guilty of not paying it, which is what you're presumably proposing.

He says I don't need to; you say you do.  The Statement of Facts doesn't address the issue of his guilt of not having paid it, and I don't think that having a little hearing about the loss amount gets to the issue of whether he's guilty of actually not paying it if we don't have it included in something.

Do you get what I'm getting at?  The amount, if it includes

just to 2012, says nothing about the amount of money he has not paid, so there's no guilt admission on his part that he didn't pay this amount, unless you're including that in there, which other than the Statement of Facts is going to say this, et cetera, and he also agrees he didn't pay it, he didn't pay whatever it is that's in the trust.  And then there's a legal argument as to whether he actually is required to legally.

But you'd at least have him agreeing he didn't pay it. Otherwise, there's no admission that he didn't -- that it was owed because he didn't pay it or he actually had this income and didn't pay it.  There's no guilt, and my doing it as a finding doesn't work if he's not agreed that that's it.  We don't have his factual underpinning.

MR. CLARKE:  Your Honor, it's undisputed that for the trust years he didn't pay tax on that income, and we can put it in the Statement of Facts.

THE COURT:  I'm trying to get at what's in the Statement of Facts that would -- if the Statement of Facts includes through the 2012 but also includes a factual statement that he agrees to that there was this kind of income that, from his perspective, is in the trust but this was the income and he didn't pay the tax on it, then I think there is a finding that covers what he is agreeing to but also -- he's not agreeing that he owes it, but he's agreeing that he didn't pay it.  So there's at least a guilt finding that he didn't pay this amount.

Then you take the he agrees he didn't pay this amount, and you're looking at the loss, and so there's no dispute as to that amount.  The issue is legally, you know, what's the theory that either he has to pay it or he doesn't have to pay it as a part of the loss.  Because if you don't include that, then that sort of sits out there without any admission on his part that he actually -- if I find according to the government's thing that he actually has to pay it, he hasn't agreed to that, and we haven't had a trial or something else on it.

MS. RANNEY:  So if I could take a minute to consult with co-counsel, I think that would be helpful, because I want to make sure that I'm checking my response here.  But I will put a couple of additional facts into this discussion to give a little bit of context.

So my understanding is -- and Mr. Clarke can correct this if I'm wrong, but that the Statement of Offense, as conceived now, essentially Mr. Edelman admitted that he created these companies and that he was the owner of them at least up until this point in time.

And the government's case as charged is that he was the creator of the companies and he was the owner for the whole time.

And as Mr. Clarke said earlier, his position is that when there was this trust created in 2012, that ownership of these entities transferred to someone else, and so the tax obligations

changed.

The government has, you know, a different view of the facts, and I think that that different view involves both factual matters and legal matters. For example, our view is that the trust was a sham and that Mr. Edelman's control before and after the creation of the trust didn't change, et cetera. So you can see how that involves both kind of factual and legal issues.

THE COURT: Who is deciding that? I mean, the concern I have is that in trying to split this -- I think the first thing is that he made the company, he controlled the company. He's evidently agreed to 2012, if the facts indicate he set up a trust and he didn't pay whatever the amounts were for that, so there's no dispute that he didn't pay it.

So the only question is, am I expected to determine whether it's a sham or not? That's what I'm trying to figure out as to what am I actually doing, or is it like a mini -- where it's stipulated facts and there's like a mini bench trial in here or something?

MS. RANNEY: So in this theoretical scenario where we would be having a hearing, the government would be presenting both facts and law about the fact that the trust was a sham.

THE COURT: What are the facts? The facts would be we -- we have an agreement in the statement that he would agree he made this income after 2012 and didn't pay it, presumably?

He's not disputing that.  So then you would have the Court -- so he would admit there would be guilt that he actually didn't pay it.

But the concern, you know, in most of these things is the mens rea that's involved with it.  You can make a mistake, and that's not good enough in terms of charging you.  So I'm concerned that in terms of the additional amount that he didn't pay, that once it went into his trust, as to what's his mens rea, which gets to the sham business, in terms of whether it was set up as a sham or he knew he owed it and decided to do this or he made a mistake and thought he could set this up and he wouldn't have to pay it.

So I want to make sure that there's actually some -- either it has to be that he agrees to certain disputed facts or facts that make it clear you're just then applying the law, or you need to do it as sort of a plea kind of thing and then almost like a bench trial in terms of deciding whether or not it was a sham, because it goes to his guilt.  It goes to issues -- proving the sham gets into his mens rea, what was his purpose, et cetera, which gets to the guilt.  And if he's not guilty, I don't see how you can decide that it should be the loss included.

MS. RANNEY:  So in -- it's the standard position under the tax guidelines to argue that a full scope of someone's pattern of conduct should be included within the sentencing

under the tax loss guidelines.  So we would be taking a position like we do in most sentencings, when there's uncharged conduct outside of the statute of limitations, potentially other types of tax conduct that aren't charged but are a part of the overall scheme, so this is an argument that we often make at sentencing in tax cases where we're asking the Court to consider someone's overall pattern of conduct in fashioning the end tax loss number that drives the guidelines.

And that sometimes requires kind of factual findings about well, he was committing his individual income tax evasion, but that also involved evading some of his employment taxes as well, looking at the entire picture of someone's pattern of conduct at sentencing.

THE COURT:  I'm still concerned about the fact that, as I said, if he agrees he didn't pay it and that's undisputed, but you're going to be -- if you went to trial, you would basically present the sham thing in terms of indicating.  He would argue he didn't owe it because he transferred it, and he could testify or somebody would present that.  And then you would be arguing that it was a sham with whatever evidence you had.

So we're basically taking that piece and having the Court decide it.  So I don't know whether that's almost like a bench trial where he would have to waive a jury trial decision on that aspect of it.  I think it's more than just, you know, what's

included in terms of -- you're making a full decision about the sham, which goes to his mens rea.  I mean, to my mind, it goes to whether he's guilty of not paying it because he knew he had owed it and he just set this trust up to get out of paying it or he actually, you know -- he made a mistake, in which case he's in a different posture about it.

That goes to more than just sentencing, loss amounts.  I'm hardly a tax expert, but it concerns me in terms of what's been doing.

Your colleague is anxious to talk to you.

MS. RANNEY:  Why don't I take a minute to speak with co-counsel and potentially with Mr. Clarke as well.

THE COURT:  And part of it is what's going to be in the Statement of Offense and also whether you really need factual findings that are disputed.

The relevant conduct he still has to be guilty of.  It may not be encompassed in the trial.  He still has to be guilty of this related conduct.  You still have to prove that it was a sham; right?  You still have to prove that.

So it goes to his guilt, and I'm concerned.  I don't see that as -- the related conduct I've always seen is in terms of looking at some additional information where you're not getting into -- if it was just that he didn't pay it, just that he knew -- he agrees that he didn't pay it and you want to discuss bringing that in, that would be one thing.  But this goes beyond

that.  This goes into really his mens rea.  If he's set it up and it's a mistake and he didn't pay it, then I'm not sure he should.  But it's a factual determination about whether or not he gets to the guilt, frankly, of whether he -- whatever the mens rea is in terms of the tax evasion.

MS. RANNEY:  Well, so I will offer up one scenario where this happens often in return preparer cases, where a tax return preparer is convicted at trial on, let's say, six counts of preparing false tax returns for clients, but this tax return preparer had a business where he prepared hundreds of returns.

So at sentencing, the government will often introduce --

THE COURT:  And that's fine, but see, this is different, because this isn't just that he didn't -- if you included he didn't pay it and then you wanted to -- he doesn't admit to it other than -- that he owes it, but he admits that he didn't pay it, let's put it that way, I could see bringing it in.  But you're getting to whether he was actually required to pay it, which is a different issue than the tax preparer who is doing the same thing over and over again, which is a pattern of not preparing them correctly or doing something differently.

Here, you would get to the issue of whether he's actually guilty, and therefore, if he's not guilty because he mistakenly thought he could do this or whatever reason you would come up with, it gets to his guilt, his mens rea.  I don't quite see how you could just lump it in with related conduct without having

that addressed in some way, which you can address it, as I said, in a combination of these are the stipulated facts and some sort of bench thing, that he waives his jury trial for that portion, and the Court makes a decision factually on it, which goes to then deciding the law and applying it to the facts I've concluded, which gets to the sham business.

You may need to take a look, but that's my concern.

MS. RANNEY:  Why don't I consult with my co-counsel and --

THE COURT:  It may also be that once you put the facts together, the Statement of Facts, that it may not be -- it may cover it sufficiently.  But do you understand what I'm concerned about?  I don't see it totally as just related conduct.  Related conduct has a pattern of doing the same thing.

Here, he's saying I didn't do the same thing because I had a legal defense, which was that I put it in a trust.  And if he thought he was taking care of it by putting it into the trust, then he's -- putting it in broad terms, there's a question as to whether he's actually guilty of that.

If he did it as a sham, that's a different issue.  Then I agree with you.  Then you're into should this be included or not based on various theories.

But I think there's a problem here about if there's no finding that he actually is guilty of it.

MS. RANNEY:  I think the government's view is this was

one overall course of conduct where Mr. Edelman concealed his relationship to these entities over a nearly 20-year span by using a variety of nominees, including the trust.

And so we do view it as kind of one overall pattern of conduct, and I think that would be the basis or the starting point for our sentencing argument, which would probably include, you know, several different scenarios of look, even if you were to accept that the trust was not a sham, then he would have owed gift tax on the gift of this asset, which was at that time approximately 40 percent of the value of this company with billions of dollars of U.S. contracts.

And so even under his scenario, the tax loss is, you know, X amount, which is still over the 65 into the base offense level.

THE COURT: But you're still going to have me, what, deciding -- having a factual record that everybody has agreed to and that covers what you need and just following the law is not a problem. My concern is that what I'm deciding is basically -- unless you do it as like a bench trial kind of thing, is that I'm deciding his guilt in order to make a decision whether or not he -- this should be included, in other words that this is -- he did this as a sham or he didn't do it as a sham, which would go to what should be included in the loss.

MS. RANNEY: Why don't I take a second to consult with my co-counsel. It looks like Mr. Clarke has a point to add as

well.

MR. CLARKE:  Your Honor, I would just draw your attention to comment 2 in the tax -- 2(t)(1) that talks about the total tax loss attributable to the offense.  It talks about what Ms. Ranney talked about and this continuing pattern, including the violations involve the same or series of related transactions, which I think is exactly what the government is arguing.

You will not be asked -- first of all, from our perspective, if you're more comfortable having a bench trial or something on this issue, we're fine with that.

THE COURT:  There's no point in doing it if it's not necessary.

MR. CLARKE:  I don't think you need to.  I think that comment talks about how you pull in all of the relevant violations for purposes of coming up with the tax loss number.  This happens in these tax cases a lot.  And I think that's what you're doing.  You're not finding him guilty of 13, 14, 15, 16, 17.  You would be finding that the violations involved the same or related series of transactions.  We're going to say it isn't, because we're going to point you to that regulation saying he can gift an asset any time he wants to anybody, even for tax purposes.  And we're going to say it was gifted, and they're going to argue against that.

So I think this is fine.

THE COURT:  I'm trying to figure out, then, what factually is there.  If he agrees he didn't pay it and the issue is legally whether or not it's a gift or something, so I'm missing what facts I would be deciding.

MR. CLARKE:  There are facts that you decide in any -- any tax loss amount, you find facts in a sense.  If there's a dispute about whether --

THE COURT:  I understand the loss thing, but the underpinning for deciding on the loss, I'm trying to -- why don't I suggest this.  Time is running out, and to be frank, at 12:00, like a pumpkin, I need to get out of here because I have another commitment.

We can work this out.  It's a matter of structurally how to do this.  I want to make sure there's no issue, it's covered.  And I understand why he wants to split this.  But it's not splitting the conspiracy.

I would suggest that you -- we'll set a date today giving me the Statement of Offense.  That would include whatever the two of you have agreed to for the plea.  And then I get a short little memo about what it is that is going to be at this additional hearing before the sentencing, which the additional hearing would be to figure out, you know, do you need -- do we need to go to trial, do they want to go forward, and whether this is it for the sentencing or there needs to be something further in terms of a trial and then a second sentencing.

So we would have a short memo about what it is that's going to happen at this hearing you're proposing and what the law is to support, you know, whatever your regulations, et cetera.

And if you file something, you can file it jointly or however you want to do it, and then let me take a look at it and see whether I'm satisfied we can do it this way. It's a structural issue. I don't think it's something that can't be taken care of. But I do want to make sure that it's structured correctly and that there isn't an issue here.

MR. CLARKE: Understood, Your Honor.

THE COURT: Because I have to say, it's somewhat unusual, that there are disputes about the loss amount, obviously, that happens all the time frankly with forfeiture, restitutions regularly that we have, no matter what kind of case you've got.

This, it seems to me, gets into some factual decisions that I'm making that I want to make sure fit into the sentencing format and not really what would be done at a trial and determination of guilt. Okay?

So when can you get it in? It would be a Statement of Offense and then some sort of short memo that says what factually you're proposing and what's the support for being able to do this as a sentencing issue and not actually the merits, I guess is the best way of putting it.

So it would be the sentencing issue or really a merits

issue, in which case it would determine how we're doing it.

Look at your calendars and figure out what works.

(Counsel conferred.)

MR. CLARKE:  Close of business Monday, Your Honor?

THE COURT:  That's fine.  So basically, the Statement of Offense that you've agreed to for the plea, and then in terms of this hearing, the factual development, whether it's a sentencing issue or it basically gets to the merits.

MR. CLARKE:  And we will give you law on that, Your Honor.

THE COURT:  And with the law in terms of supporting -- you seem to both think it's the same thing.  So if you're in agreement, it makes it easier.

That's fine.  As soon as I look at it, what I will do is get back to you to set up, you know, the plea or whatever other proceeding.  I will wait until I get it so I can figure out, you know, whether I have any further questions or that solves it.

MR. CLARKE:  Okay.  Just one -- we're also going to be filing our motion for reconsideration on his remand.  We will do that next week as well.

THE COURT:  Okay.

MR. CLARKE:  And then just for my own personal scheduling, I have a competing issue on June 4th now.  I don't think we need that date, Your Honor.  That's like a status date that we otherwise have.

THE COURT:  Yeah, that's pretty far out.

MR. CLARKE:  Somebody else is trying to schedule something on my calendar that date, Your Honor.  If we don't need that, it would be great if we could --

THE COURT:  I don't have a problem with taking it out. Once I get it Monday, I will set a date.  I don't like leaving criminal cases without other dates that proceed along so it moves along.  I will wait until I get -- we can vacate the June 4th, and I will -- although we've done the speedy trial through the June 4th date, which -- so I think it actually covers it sufficiently for this interim period while we figure out how to take care of this.

MR. CLARKE:  Okay.

THE COURT:  But let me just ask, Mr. Edelman, at this point, looking at this -- the last time we were here, we did it through June 4.  So the 70 days is August 13.  The 90 days is September 2nd.

So do you have -- we will obviously be doing something in between here.  But do you still agree to continuing the speedy trial rights at least to the June 4th date, even if we vacate the hearing?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So let me wait to see what you give me.  You hopefully understand what my concern is. I want to make sure we're -- I'm not proceeding to sentencing

when it actually includes a merit issue.

MR. CLARKE:  We understand, Your Honor.

THE COURT:  All right.  The parties are excused.  Take care.

And I can either get two different memos or one memo that you both agree on, however you want to do it.

(Proceedings adjourned at 12:03 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick_____          May 23, 2025_____

SIGNATURE OF COURT REPORTER          DATE