**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DOUGLAS EDELMAN, *et al*.,<br><br>Defendants. | Criminal Action No. 24-239 (CKK) |

**MEMORANDUM RE APRIL 29, 2026, EVIDENTIARY HEARING**
(April 27, 2026)

On April 29, 2026, the Court will hold an evidentiary hearing regarding specific factual issues that are relevant to the Court's sentencing of Mr. Douglas Edelman. Mr. Edelman has pled guilty to conspiring to defraud the United States from 2008 to 2021; making false statements to the IRS in 2016; making false statements to the Department of Justice in 2018; and evading taxes for the years 2006 to 2012. Mr. Edelman maintains his innocence with respect to charges that he evaded taxes for the years 2013 to 2020 and filed false financial reports for the years 2007 through 2020.

The parties agree that, at sentencing, the counts that Mr. Edelman has pled guilty to will be "grouped" and treated as one count. *See* Joint Notice of Authority, Dkt. No. 78 at 2 n. 1 (citing USSG §§ 3D1.1,3D1.2). Mr. Edelman's base offense level for this count will be determined by the "total tax loss" attributable to his offense. USSG § 2T1.1. In determining the total tax loss attributable to Mr. Edelman's offense, the Sentencing Guidelines direct the Court to consider the tax loss attributable to all of Mr. Edelman's "relevant conduct," which is defined in this context as "all conduct violating the tax laws" that is not "clearly unrelated" to his offense. *Id*. comment (n.2) (citing USSG §1B1.3(a)(2)). The parties agree that "courts routinely accept as relevant

1

conduct facts, proven by a preponderance of the evidence, relating to uncharged counts." Joint Notice of Authority, Dkt. No. 78 at 4.

The total tax loss attributable to Mr. Edelman's offense will be determined primarily by the loss stemming from Mr. Edelman's failure to pay taxes on income he earned from the company Mina/Red Star. There is no doubt that the total tax loss will include any loss caused by Mr. Edelman's *admitted* evasion of taxes on his Mina/Red Star income from 2006 to 2012. But the parties dispute whether the total tax loss should include any loss caused by Mr. Edelman's *alleged* evasion of taxes on his Mina/Red Star income from 2013 to 2020. Mr. Edelman argues that the total tax loss attributable to his offense should not include any losses from 2013 to 2020 because he "contributed" his interest in Mina/Red Star to a trust—the Galactea Trust—in 2013 and therefore did not owe any taxes on Mina/Red Star's income during that period. The Government argues that the total tax loss attributable to Mr. Edelman's offense *should* include any losses from 2013 to 2020 because it has shown, by a preponderance of the evidence, that the Galactea Trust should be disregarded as a sham because it lacked economic substance and that Mr. Edelman willfully evaded taxes on his income during this period.

Accordingly, the total tax loss attributable to Mr. Edelman's offense—and, in turn, Mr. Edelman's base offense level—depends on whether the Galactea Trust was a valid trust or a sham. The parties have briefed this issue, and the hearing scheduled for April 29, 2026, will provide them with a final opportunity to present argument and evidence to support their positions. To effectively and efficiently channel the parties' presentations at this hearing, the remainder of this memorandum shall provide, in summary form, the Court's preliminary findings of fact and conclusions of law regarding the issues relevant to this hearing.

***

**First, the Court is inclined to conclude on the present record that the question of whether the Galactea Trust lacked economic substance and should be disregarded as a sham is primarily a question of fact that is analyzed under a framework provided by federal law.**

The Galactea Trust[1] and its related trusts were created under the laws of the British Virgin Islands, England, and Wales. The Government appears to concede that under the relevant foreign laws, the Galactea Trust is valid on paper. *See* Gov't's Resp., Dkt. No. 125 at 3 ("The government does not dispute that these entities were trusts set up in the UK and BVI."). In other words, the Government does not dispute that the Galactea Trust's organizing documents, as interpreted under the relevant foreign laws, adequately identify (1) a donor, (2) property, (3) a trustee to take title to the property for the purpose of protecting or conserving it, and (4) designated beneficiaries.

But the validity of a trust on paper is not dispositive when determining whether to attribute income to a taxpayer. *See Richardson v. Comm'r*, 509 F.3d 736, 740–41 (6th Cir. 2007). A trust must have economic substance to be valid for purposes of assessing federal income tax, which means it must change the taxpayer's economic position in a meaningful way apart from its effect on federal income tax and have a substantial purpose apart from its impact on the taxpayer's federal income tax. 26 U.S.C. § 7701(o).[2] Whether a trust lacks economic substance is a question of fact that is determined under a framework provided by federal law.[3] If a trust lacks economic effect and does not alter a cognizable economic relationship, then the Court may ignore the trust as a sham and apply the tax law in accordance with the entity's substance.

---

[1] While the Court shall refer to the Galactea Trust throughout this memorandum, the Court's analysis applies with equal force to the handful of other trusts that were created during the relevant period and used by Mr. Edelman.

[2] *See also Full-Circle Staffing, LLC v. Comm'r of Internal Revenue*, 115 T.C.M. (CCH) 1341 (T.C. 2018), *aff'd in part, appeal dismissed in part sub nom. Full-Circle Staffing, L.L.C. v. Comm'r of Internal Revenue*, 832 F. App'x 854 (5th Cir. 2020) (citing *Zmuda v. Commissioner*, 79 T.C. 714, 719 (1982), *aff'd*, 731 F.2d 1417 (9th Cir. 1984); *Markosian v. Commissioner*, 73 T.C. 1235, 1241 (1980)).

[3] *Full-Circle Staffing*, 115 T.C.M. (CCH) 1341 (T.C. 2018) (citing *Paulson v. Commissioner*, T.C. Memo. 1991-508, *aff'd*, 992 F.2d 789 (8th Cir. 1993)).

3

The defense appears to suggest that it would be inappropriate to analyze the economic substance of the Galactea Trust without reference to foreign law because Congress's codification of the economic substance doctrine at 26 U.S.C. § 7701(o) rendered the doctrine a creature of statutory interpretation.[4]  But this argument is not supported by the statute or the caselaw cited by the defense.  Section 7701(o) directs the Court to determine whether the economic substance doctrine is relevant in the same manner as if the statute had never been enacted.  26 U.S.C. § 7701(o)(5)(C).  And the caselaw clearly shows that the economic substance doctrine has been (and therefore is) relevant to trusts.

Accordingly, in determining whether the Government has shown by a preponderance of the evidence that the Galactea Trust lacked economic substance, the Court is inclined to analyze the evidence under the framework provided by federal law.  While local law is relevant to analyzing a trust's organizing documents, it does not play a role in determining whether the facts surrounding the use of a trust establish a lack of economic substance.

***

**Second, the Court is inclined to conclude on the present record that the Government has shown by a preponderance of the evidence that the Galactea Trust lacked economic substance and should therefore be disregarded as a sham.**

Courts generally consider the following four factors when determining whether a trust lacks economic substance: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether an independent trustee existed to prevent the taxpayer from acting solely in their own interests; (3) whether an economic interest in the trust assets passed to other beneficiaries; and (4) whether the taxpayer felt bound by the

---

[4] *See* Def.'s Br., Dkt. No. 115 at 13 ("In the modern era, 'economic substance,' refers to the rule of statutory interpretation, portions of which Congress codified at 26 U.S.C. § 7701(o).").

restrictions imposed by the trust or the law of trusts. *See Richardson*, 509 F.3d at 742; *Markosian v. Commissioner*, 73 T.C. 1235, 1241 (1980)). After considering the evidence in the context of these four factors, the Court is inclined to conclude on the present record that the Galactea Trust lacked economic substance and should therefore be disregarded as a sham.

Regarding the first factor, the present record suggests that Mr. Edelman's economic relationship to Mina/Red Star and the income it generated did not change after the creation of the Galactea Trust. The evidence shows that Mr. Edelman continued to operate Mina/Red Star as a partner with his co-founder Erkin Bek following the creation of the Galactea Trust.[5] It also shows that Mr. Bek caused Mr. Edelman to sell his portion of Mina/Red Star in 2020 because he had become concerned about Mr. Edelman concealing the nature of his interest in Mina/Red Star.[6] Furthermore, the evidence suggests that Mr. Edelman's relationship to the income generated by Mina/Red Star did not change following the creation of the Galactea Trust. Mr. Edelman continued to direct Mina/Red Star to issue profit distributions, and he continued to channel those distributions into the same companies he invested in before the Galactea Trust was created.[7] Many

---

[5] *See, e.g.*, Gov't's Ex. 25-2, Dkt. No. 118-10 (where Mr. Edelman and Mr. Bek discuss firing Mina/Red Star's CEO and CFO in 2015); Gov't's Ex. 25-4, Dkt. No. 118-12 (where Mr. Edelman and Mr. Bek discuss selling Mina/Red Star in 2016); Gov't's Ex. 25-3, Dkt. No. 118-11 at 2 (where Mr. Bek emails Mr. Edelman, referring to him as his "partner," about issues regarding Mina/Red Star's expenses, suggesting that they decide between the two of them who should "take ultimate power" so they could "just have one decider of everything, a controlling holder," and Edelman agrees, saying that they needed "to speak with a single voice and give serious solid directions and instructions to people asap," and that he would obtain the "deep accounting information" to "analyse it all"); Collett Depo. Tr. (Feb 5, 2025), Dkt. No. 118-28 at 132 (where Mr. Collett reads a 2019 email from Mr. Bek that states: "My partner and ultimate beneficial owner is Douglas Edelman. . . . It is not Delphine. It is not Leonard, or his sham trust companies. There's one and only partner and UBO – Douglas Edelman."); Gov't's Ex. 25-5, Dkt. No. 118-13 at 1 (2018 email chain where Mina/Red Star employee asks Edelman and Bek to "share [their] respective cell numbers (ie, Erkin and Delphine)" in response to a DoD inquiry, with Edelman responding that Le Dain was "so 'not involved' not sure what she say if she got a call").

[6] *See* Collett Depo. Tr. (Feb 5, 2025), Dkt. No. 118-28 at 132 (where Mr. Collett reads a 2019 email from Mr. Bek that states: "After reading – receiving various conflicting messages in regard to your side of ownership, mixed with various multiple misrepresentations made from your side by Remco, Graham, Leonard and Douglas, I conclude that you are playing with fire on compliance business operational issues and not taking them seriously.").

[7] *See, e.g.*, Gov't's Ex. 25-6, Dkt. Nos. 118-14, 118-15 (email where Mr. Edelman tells Mr. Bek he would like to direct a profit distribution); Collett Depo. Tr. (Feb. 4, 2025), Dkt. No. 118-27 at 118-121 (where Mr. Collett testifies that Mr. Edelman directed the investments that were channeled through the Galactea Trust, and did so on the basis of personal connections rather than any investment strategy); *id.* at 102–06 (where Mr. Collett testifies that Mr. Edelman

of the companies that received these distributions were then used by Mr. Edelman to make a variety of purchases and serve as the nominal owner of those purchases.[8]

Regarding the second and third factors, the Court is inclined to conclude on the present record that the Government has shown by a preponderance of the evidence that the Galactea Trust did not have an independent trustee to prevent Mr. Edelman from acting solely in his own interests, and that because of this, the beneficiaries of the Galactea Trust did not obtain any true economic interest following the creation of the Trust. Mr. Edelman's longtime accountant Graham Collett was the protector of the Galactea Trust, which means he oversaw the trustee Leonard O'Brien, who was required to act in the interests of the Trust's beneficiaries (Mrs. Le Dain and her children).[9] Mr. Collett testified, however, that he could recall only one instance where Mrs. Le Dain was consulted on the many investments that Mr. Edelman directed the Trust to make, and he could not recall a single time where the trustee of the Trust refused to make an investment that Mr.

---

directed the Galactea Trust to continually invest in a Kenyan farming business that Mr. Edelman began investing in before the creation of the Galactea Trust); *id*. at 106–08 (where Mr. Collett testifies that Mr. Edelman directed the Galactea Trust to continually invest in a satellite and communications business that Mr. Edelman began investing in before the creation of the Galactea Trust); Gov't Ex. 25-6, Dkt. No. 118-14 (June 2015 email exchange between Mr. Edelman and his business associate Robert Dooner where Mr. Edelman directs Mr. Dooner to "get the best deal you can and make sure we've all the rights we need," before adding: "Board seat is you for sure. I'm not really involved at all of course .. Shareholder will be an entity etc and end up in an easy kyc trust etc. Don't want any usa connection in this of course."); Collett Depo. Tr. (Feb. 4, 2025), Dkt. No. 118-27 at 109–10 (testifying that Mr. Edelman directed the Galactea Trust to continue making investments in a Chinese media company that he began investing in before the Trust was created, adding that these investments were based on his personal relationship with a Chinese investor in the company); *id*. at 110–112 (testifying that Mr. Edelman directed the Trust to continue making investments in a holding company that held land in Mexico, which, as of 2020, had not made any money for the Trust); *id*. at 112–115 (testifying that Mr. Edelman directed the Trust to continue investment in a holding company for various interests in oil exploration, which, as of 2020, had not made any money for the Trust); *id*. at 115–119 (testifying that Mr. Edelman directed the Trust to continue investing in multiple entertainment companies on the basis that Mr. Edelman was interested in media and film); Gov't Ex. 25-7, Dkt. No. 118-16 (2016 email chain between Mr. Edelman and Mr. Collett where Mr. Edelman tells Mr. Collett that they "really do need in place 23 or 24 million" into a Mexican fuel logistics company, adding: "We should not use sssl for all these payments anymore. We need a better entity and structure. Every time sssl makes a payment there are now always lots and loads of questions from the banks receiving the money.").

[8] *See, e.g.*, Gov't Ex. 14-63, Dkt. No. 118-5 (2016 email chain showing that Mr. Edelman authorized the purchase of a home in Mexia for his ex-wife, to be owned by one of his holding companies); Collett Depo. Tr. (Feb. 4, 2025), Dkt. No. 118-27 at 139–44 (where Mr. Collett testifies that Mr. Edelman directed him to purchase two yachts using one of Mr. Edelman's holding companies).

[9] Def.'s Br., Dkt. No. 115 at 19 (citing Collett Depo. Tr. at 21:8-11 (Feb. 3, 2025)).

6

Edelman requested despite the fact that these investments appeared to provide very little return for the Trust.[10]  This suggests that the Galactea Trust did not have an independent trustee to prevent Mr. Edelman from acting solely in his own interests.

Because the Galactea Trust did not have an independent trustee to prevent Mr. Edelman from acting solely in his own interests, the beneficiaries of the Trust—Mrs. Le Dain and her children—did not obtain any real economic interest in the Trust's assets.  This apparently led to a depletion in the Trust's assets.  In 2020, Erkin Bek, Mr. Edelman's Mina/Red Star co-founder, froze all Mina/Red Star distributions to the Galactea Trust in an attempt to force Mr. Edelman to stop hiding his ownership stake in Mina/Red Star.[11]  This freeze apparently led Mrs. Le Dain to seek information regarding the Trust's assets for the first time, and she did not like what she discovered.  In communications with Mr. Collett, Mrs. Le Dain appeared frustrated and confused: "I just do not understand.  We keep investing in long term, shaky, very uncertain deals when in the short term we cannot even pay the bills."[12]  As Mr. Collett testified, many of these shaky deals were made by Mr. Edelman on the basis of his personal relationships.  If the trustee had been independent, then Mr. Edelman's personal relationships would not have factored into the Trust's investment decisions, and perhaps Mrs. Le Dain and her children would have obtained an economic interest in the Trust's assets.

Regarding the fourth and final factor, the Court is inclined to conclude on the present record that the Government has shown by a preponderance of the evidence that Mr. Edelman did not feel bound by the restrictions imposed by the Galactea Trust or the law of trusts.  The evidence strongly suggests that Mr. Edelman lied to the attorneys that created the Galactea Trust by telling them that

---

[10] Collett Depo. Tr. (Feb. 4, 2025), Dkt. No. 118-27 at 123; Collett Depo. Tr. (Feb. 5, 2025), Dkt. No. 118-28 at 121.
[11] *See* Collett. Depo. Tr. (Feb. 5, 2025), Dkt. No. 118-28 at 120–30.
[12] *Id*. at 129.

Mrs. Le Dain co-founded and co-owned Mina/Red Star with Erkin Bek.[13]  That Mr. Edelman caused the Galactea Trust to be created out of a lie suggests he did not feel bound by the Trust or the law of trusts from the very start.  And nothing about his use of the Trust suggests those feelings changed.  As discussed above, Mr. Edelman used the Galactea Trust to make the same types of investments to many of the same companies that he invested in before the creation of the Trust.  This suggests that Mr. Edelman did not feel bound by the restrictions of the Galactea Trust, which included a restriction that prohibited Mr. Edelman from being a beneficiary of the Trust.[14]  Furthermore, as the Government explains, the fact that Mr. Edelman created so many different trusts for his various investments suggests that he did not consider the law of trusts to be binding on his activities.[15]

In sum, the Court is inclined to conclude on the present record that the Government has shown by a preponderance of the evidence that the Galactea Trust and associated trusts lacked economic substance and should therefore be disregarded as shams.  The creation of the Galactea Trust did not change Mr. Edelman's relationship to the Trust's assets.  Furthermore, the Galactea Trust did not have an independent trustee to prevent Mr. Edelman from using the Trust's assets for his own personal interests, which in turn prevented the Trust's beneficiaries from obtaining any real interest in the Trust's assets.  Finally, the present record sufficiently shows that Mr. Edelman did not feel bound by the restrictions of the Galactea Trust or the law of trusts.

***

---

[13] *See*, *e.g.*, Collett Dep. (Feb. 5, 2025), Dkt. No. 118-28 at 44–5 (testifying that Mr. Edelman engaged the law firm and then lied about ownership); Gov't's Ex. 4-5, Dkt. No. 118-1 at 54 (the law firm's report showing that it believed Mrs. Le Dain owned half of Mina/Red Star); Gov't's Ex. 24-1, Dkt. No. 118-8 (where Mr. Edelman emails Mr. Collett a series of lies that he planned to tell the general counsel of Mina/Red Star regarding his ownership).
[14] Expert Report of John Machell KC, Dkt. No. 119-1.
[15] *See* Gov't's Br., Dkt. No. 116 at 27.

**Third, the Court is inclined to conclude on the present record that the Government has shown by a preponderance of the evidence that Mr. Edelman knew he was earning income from Mina/Red Star from 2013 to 2020 and evaded taxes on that income.**

The Court does not view Mr. Edelman's conduct from 2013 to 2020 in isolation. Mr. Edelman has pled guilty to evading taxes on his Mina/Red Star income from 2006 to 2012 by hiding that income in a sham foundation—the Sunage Foundation—that was purportedly created for the benefit of his wife, Mrs. Le Dain, and their children. The question is whether Mr. Edelman did the same thing through an entity with a different name from 2013 to 2020. The evidence before the Court strongly suggests that Mr. Edelman followed the same modus operandi for the years 2013 through 2020 as he did for the years 2006 through 2012. As discussed above, Mr. Edelman continued to operate Mina/Red Star as if he was a co-owner and spend its earnings as if they were his and his alone. He also continued to lie about Mina/Red Star's founding, stating to his own attorneys and the Government that Le Dain was the original co-founded and co-owner. Indeed, Mr. Edelman has already pled guilty to making false statements on this topic to U.S. investigators in 2016 and 2018. Moreover, he continued to lie about other taxable events, including other unreported income, a gift to his son he disguised as a loan, and an unreported sale of a pub he owned in Kyrgyzstan.

Accordingly, the Court is inclined to conclude on the present record that the Government has shown by a preponderance of the evidence that Mr. Edelman willfully intended to evade taxes on income derived from Mina/Red Star from 2013 to 2020.

***

9

***Finally*, the Court is inclined to conclude on the present record that the Government has proven the total tax loss for the years 2006 through 2020 by a preponderance of the evidence.**

Because the Government has adequately shown on the present record that the Galactea Trust was a sham and Mr. Edelman evaded taxes on his Mina/Red Star income for the years 2013 through 2020, the Court is inclined to determine the total tax loss attributable to Mr. Edelman's offense by looking to the tax loss for the years 2006 through 2020. The Government estimates that the total tax loss attributable to Mr. Edelman's offense for the years 2006 through 2020 is $128,995,238. Based on the Government's evidence, the Court is inclined to conclude on the present record that this figure is a reasonable estimate of the total tax loss. *See United States v. O'Doherty*, 643 F.3d 209, 218 (7th Cir. 2011) ("The Government must prove tax loss figures at sentencing by a preponderance of the evidence.").

***

The above preliminary conclusions delineate the scope of the April 29, 2026, evidentiary hearing, which will be focused on determining the validity of the Galactea Trust for purposes of ascertaining the total tax loss attributable to Mr. Edelman's offense. If either party disputes any of these preliminary conclusions—or if they believe that additional conclusions are necessary to determine the validity of the Galactea Trust—then they shall come to the April 29, 2026, hearing prepared to present their arguments to the Court.

**Dated:** April 27, 2026

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

10